IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| SHERWOOD BRANDS, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. RDB 03-1544 |
| | * | |
| LEONARD LEVIE, *et al.*, | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

On April 24, 2003, Plaintiff Sherwood Brands, Inc. ("Plaintiff" or "Sherwood") initiated

this action by filing a complaint in the Circuit Court for Montgomery County, Maryland against

the seven former shareholders and the former Chairman of the Board of Asher Candy, Inc.

("Asher"). The three count Complaint alleged various state law claims, including violation of

Maryland's securities laws and the tort of fraudulent inducement, in connection with a merger

and acquisition transaction between Sherwood and Asher. At the conclusion of this merger

transaction, Asher, a candy cane manufacturer located in New York, became part of Sherwood, a

manufacturer of confectionary products and gift items headquartered in Maryland. On May 27,

2003, this case was removed to this Court, pursuant to 28 U.S.C. § 1441(a), based on diversity of

citizenship of the parties. Accordingly, this Court has original jurisdiction pursuant to 28 U.S.C.

§ 1332. For the reasons that follow, this Court enters judgment in favor of Defendants, the

Levies, and against Plaintiff, Sherwood, on all remaining Counts in Plaintiff's Complaint. On

Leonard Levie's counterclaim, the Court enters judgment in favor of Counterdefendant

Sherwood and against Counterplaintiff Leonard Levie.  As for Eleanor Levie's Counterclaims, judgment is entered in favor of Eleanor Levie as to Count I and Count III, as specified below, and in favor of Sherwood on Count I, as it relates to the "registration rights" claim, and Count IV, as specified below.  Count II of Eleanor Levie's Counterclaim is rendered moot.

On July 25, 2005, this Court entered an Order approving a Stipulation of Dismissal with Prejudice with respect to Defendants Robert Davidoff, Howard Davidoff, STEPCAP LLC, CMCO, Inc. and James Spampinato.  All of these Defendants ("Sellers" or "Asher shareholders") were pre-merger shareholders of Asher and James Spampinato was also the Chief Executive Officer of Asher and, post-merger, was a Sherwood employee.  The remaining Defendants, who are brother and sister, are Eleanor Levie, a pre-merger Asher shareholder, and Leonard Levie, the former Chairman of the Board of Asher.  Well earlier in this litigation, on June 3, 2003, all of the Defendants, except James Spampinato, who filed separately, collectively filed a counterclaim against Sherwood asserting breach of contract (Count I), accounting and specific performance (Count II), specific performance (Count III), and securities fraud under Maryland law (Count IV).     On December 12, 2005, this Court denied the Motion to Dismiss or in the Alternative for Summary Judgment filed by Defendants Eleanor Levie and Leonard Levie (collectively "the Levies") and, that same day, the case proceeded to trial.  Both parties presented evidence and argument during the non-jury trial held December 12-16, 2005 and December 19-22, 2005.[1]  The Plaintiff called the following witnesses: Amir Frydman, an officer

---

[1] This Court, with the consent of counsel, took testimony by means of the videotaped depositions of Carl Schaetzle and Lee Meyers on Sunday December 18, 2005.  As all objections were preserved and noted on the video depositions, this examination was conducted in chambers out of the presence of the parties.  The parties consented to this procedure to expedite the presentation of evidence in this case.

of Sherwood; Uziel Frydman, founder of Sherwood; Christopher Willi, Chief Financial Officer

("CFO") of Sherwood; Gary Epstein, partner at Greenberg Traurig and counsel to Sherwood;

and Rod Burkert, an expert witness concerning business valuation.  Defendants called the

following witnesses:  Leonard Levie, director of Asher; Matthew Roseman, counsel to Asher;

Lee Meyers (by video deposition), accountant for Asher; Carl Schaetzle (by video deposition),

controller at Asher; and William Bavis, an expert witness concerning business valuation.

At the conclusion of Plaintiff's case, Defendants moved, pursuant to Rule 52(c), for

judgment on partial findings.  For the reasons stated on the record, on December 15, 2005, this

Court granted, in part, and denied, in part, this motion and entered judgment in favor of

Defendant Eleanor Levie as to Count I (Maryland Securities Fraud) and Count II (Fraudulent

Inducement).  Eleanor Levie remained a Defendant as to Count III (Declaratory Judgment) and a

Counterplaintiff.  Leonard Levie remained a Defendant as to all three Counts contained in

Sherwood's Complaint and a Counterplaintiff on the breach of contract claim (Count I) asserted

in the counterclaim filed June 3, 2003.[2]

On January 5, 2006, the parties submitted post-trial proposed findings of fact and

conclusions of law.  The Court, having considered the evidence presented at trial and having

reviewed the parties' post-trial submissions, finds that given the opportunities for due diligence

in this case and the Plaintiff's level of sophistication, Plaintiff could not have reasonably relied

on any misstatements or omissions made by the Defendants and, as a result, Plaintiff's claims

fail.  As a result, judgment shall be entered in favor of Defendants on all remaining Counts in

---

[2]  Counsel for Leonard Levie, who was not an Asher shareholder, noted at trial that he
was not pursuing the remaining Counts contained in the June 3, 2003 counterclaim, which was
filed by his prior counsel.

Plaintiff's Complaint.  Furthermore, Eleanor Levie is entitled to relief on certain of her counterclaims, Count I and Count III, as specified below.

Based on the testimony of the witnesses at trial and the exhibits presented, the Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes the following findings of fact and conclusions of law.

I.    Findings of Fact

Leonard Levie, through his company American Industrial Acquisition Corp. ("AIAC"), a private acquisition firm based in Connecticut, purchased Asher out of a bankruptcy proceeding in 1997.  Asher was previously owed by Fleer Inc., which became a subsidiary of Marvel Entertainment, Inc.  (Pl.'s Ex. 47.)  Leonard Levie decided to gift the shares of Asher to certain individuals and entities, including his sister in repayment for an act of kindness from earlier years.  As a result, Eleanor Levie became a 55% shareholder of Asher.  Leonard Levie, who was experienced at acquiring companies, had only gifted shares on a handful of occasions and rarely held no stake himself in an acquired entity.  Other than James Spampinato, who in addition to being an Asher shareholder was also its President and Chief Executive Officer ("CEO"), there is no evidence that any of the other Asher shareholders were anything but passive investors. Spampinato held a 25% interest in Asher, which was provided to him as a form of incentive compensation.

Leonard Levie, although not an officer or shareholder of the company, did become a director and was Chairman of the Board of Asher from 1997 to April 2002.  Leonard Levie was not generally involved in the day-to-day operations of Asher, but as Chairman of the Board he was involved in broad oversight of the company and the shaping of Asher's strategic direction.

At the time Asher was purchased from Marvel Entertainment, Inc., James Spampinato was the CEO of Asher and had been with the company for approximately 20 years. Spampinato remained President and CEO of Asher after the purchase by AIAC.

In fiscal year 2001, Asher began to experience financial difficulties. For fiscal year 2001, a year marked by the attacks on September 11, 2001, Asher had a pre-tax loss of approximately $800,000. After this large financial loss, Leonard Levie and James Spampinato began to examine a number of options to remedy Asher's financial issues. Generally, these options were: (1) to refinance; (2) to obtain an equity infusion; or (3) to sell the company. One idea that focused on examining a possible internal Asher restructuring is evidenced by a fax transmission between Spampinato and Leonard Levie on December 23, 2001. (Pl.'s Ex. 48; Defs'. Ex. 51.) The concept was to look at a restructuring of Asher's liabilities and generally involved exploring the possibility of entering into an agreement with various Asher creditors where they would accept partial payment from Asher. (Pl.'s Ex. 48; Defs.' Ex. 51.) This option, however, was not employed and, instead, it was determined that Asher would pursue a potential purchaser and sell the company.

Asher hired James Throne, a business broker, to help identify a list of 50 to 100 possible acquirers who were already focused on confectionary products. After considering various companies, a number of Sherwood's characteristics made it a good potential strategic fit. As previously noted, Sherwood is a candy company that manufacturers confectionary products and gift items, such as gift baskets. Sherwood, a mid-sized public entity at the time, was already in the business of manufacturing seasonal holiday products. Asher and Sherwood already shared some customers and marketing channels. James Throne contacted Sherwood to discuss a

possible merger transaction and sent the company a confidentiality agreement, an executive summary of Asher, financial statements, and projections.

Founded by Uziel Frydman in 1985, Sherwood was a public company - traded on the American Stock Exchange -  having gone public in the late 1990's.  However, Sherwood was delisted by the time of trial after, according to Christopher Willi, a "bad year" in 2002.  As a result, Sherwood is no longer exchange traded.  Uziel Frydman has an extensive business background, having worked at Lehman Brothers as an acquisition analyst and at RJR Tobacco, as well as other business experience.  Amir Frydman, Uziel Frydman's son, is a 1984 graduate of the University of North Carolina at Chapel Hill and has been with Sherwood since 1985.  At the time of trial, he was the President of Sherwood Brands, however, he was a Vice President during events that gave rise to this action.

A.  Initial Meetings and Negotiations between Asher and Sherwood

On January 14, 2002, a meeting was held at the Asher plant in New Hyde Park, New York.  Those attending on behalf of Sherwood were Uziel Frydman, CEO and Chairman of the Board of Sherwood, Amir Frydman, Vice President of Sherwood, and Christopher Willi, Sherwood's CFO.  Leonard Levie and James Spampinato were in attendance on behalf of Asher.  Spampinto and Levie presented information about Asher and handed out an executive summary, financial statements, some of which were audited, and a printed PowerPoint presentation as part of this meeting.  (Pl.'s Exs. 12; 47.)  The meeting was to educate Sherwood about Asher, including what synergies could be created through a potential acquisition of Asher.  (*See id.*)  The presentation materials indicated that Asher was *projected* to generate $1 million in profits for the year 2002.  (Pl.'s Ex. 47 at p. 1.)  In addition, James Spampinato led the group on a tour

of Asher's facilities, including, most notably, the plant where the candy canes were manufactured.  During this tour there was a dialogue among the group, including questions and answers, concerning the plant's capabilities.  The majority of this dialogue was between James Spampinato, who had been with Asher for over 20 years and had headed the plant operations prior to becoming CEO, and Uziel Frydman, who has some background in manufacturing operations.  (Pl.'s Ex. 47.)

Sherwood knew that Asher was a troubled company, as the fiscal year 2001 losses were disclosed in the initial meeting between the two companies.  (Pl.'s Ex. 47.)  In fact, Sherwood had some prior experience with companies in financial trouble, having purchased E-Rosen, a company that produces lolly pops and jelly beans, out of receivership.  After the meetings with Asher, the team from Sherwood began discussing the prospect of purchasing Asher.  Willi, Uziel Frydman, and Amir Frydman were involved in discussing Asher's value and Willi, using information he received from the January 14, 2002 meeting with Asher, analyzed Asher's financial information to determine a possible purchase price.  The Sherwood team considered Asher's financials, including audited financial statements, and requested additional information from Leonard Levie and James Spampinato.

On January 17, 2002, three days after the meeting in New Hyde Park, Sherwood sent a letter of intent to Asher.  (Defs.' Ex. 42d.)  Although Uziel Frydman did not recall this letter, it does bear his signature and offers to purchase Asher for $1.2 million.  (Defs.' Ex. 42d.)  This letter addressed the topic of due diligence, with Sherwood noting, in part "[g]iven our experience, we believe that we can be very efficient in our due diligence process if we are afforded the necessary access, which the Company agrees to provide."  (Defs.' Ex. 42d at

4(a)(i).)  This offer was rejected by Asher because it believed the suggested purchase price was inadequate.

A second meeting occurred on January 24, 2002 in Greenwich, Connecticut.  Christopher Willi met with Leonard Levie, James Spanpinato, and James Throne.  Willi continued to review the financial information received from Asher.  Uziel Frydman, however, was not sure whether he directly reviewed the financial information Asher provided during the two initial meetings it had with Sherwood.

On February 14, 2002, a second letter of intent containing a purchase price of $1.75 million was sent to Asher by Sherwood.  Similar to the first letter, this letter of intent proposed a "stock-for-stock exchange."  (Defs.' Ex. 42d.)  In addition, this second letter of intent stated that:

> Entering into the Agreement and the related documents is subject, among other things, to the following conditions: (i) <u>Due Diligence</u>:  The completion of our due diligence review, including financial, legal, commercial, tax, insurance and environmental review, inquiries of vendors and customers, with the results of such review being satisfactory to us in our sole discretion.  Due Diligence will be commenced promptly following the execution of this letter by you and is expected to be completed within twenty-one days (the "<u>Due Diligence Period</u>") . . .

(Defs.' Ex. 42d at 10(a)(i).)  The February 14, 2002 letter of intent was accepted and signed by James Spampinato on behalf of Asher.  (Defs.' Ex. 42d.)  Negotiations between representatives from Sherwood and Asher continued and Sherwood began conducting due diligence.  Leonard Levie, although not a shareholder himself, acted as a spokesperson for the Asher shareholders during negotiations with Sherwood.  (Leonard Levie's Ans. to Interrogatories, #15.)

B.  <u>Sherwood's Pre-Merger Due Diligence Efforts</u>

Sherwood's pre-closing due diligence efforts were lead by Christopher Willi.  Amir Frydman was not involved in the financial due diligence, but did try to obtain opinions from

Sherwood's customers, some of whom were also Asher's customers.  Amir Frydman's efforts were not fruitful, as customers were hesitant to share information about their relationship with another company.

Christopher Willi utilized a due diligence checklist as a guide in heading Sherwood's due diligence efforts.  (Pl.'s Ex. 42)  Willi provided this checklist to James Spampinato in mid-February after the letter of intent was provided to Asher.  The main categories of Sherwood's due diligence efforts focused on financial aspects of Asher, any legal issues, human resources concerns, and tax issues.  (Pl.'s Ex. 42).  To consider these various areas of due diligence, Willi enlisted the expertise of other Sherwood employees, such as members of its Human Resources department, to conduct due diligence related to issues within their expertise.  Sherwood did most of the due diligence utilizing in-house personnel.  However, Sherwood also enlisted the help of tax accountants, Reznick Group, and outside legal counsel, Gary Epstein, who is partner with Greenberg Traurig LLP in its Miami, Florida office.  Gary Epstein, and associates supervised by him, assisted Sherwood with legal due diligence and with the drafting of merger related documents, such as the final Agreement and Plan of Merger ("the Merger Agreement").

During the period after the February 14, 2002 meeting, but prior to the execution of the Merger Agreement on April 25, 2002, Christopher Willi visited Asher's office in New York.  He examined insurance policies and an insurance consultant was also utilized to analyze Asher's policies.  While in New York, Willi met with Asher's Controller and Sherwood's Controller also traveled to New York to conduct due diligence.  Willi examined tax records and requested additional tax filings.  Representatives from Sherwood's Information Systems department also visited Asher to examine issues within their expertise.  Additionally, during the period of these

visits, Sherwood also began paying some of Asher's bills to outside vendors.  Leonard Levie was not involved in the due diligence process and did not review due diligence information being provided to Sherwood.  Instead, it was mostly handled by Asher employees, who were involved in the day-to-day operations of the company.

### C.  The April 25, 2002 Merger Agreement

Even though Gary Epstein, Sherwood's attorney, characterized this merger as a loosely documented transaction, on April 25, 2002, the Merger Agreement between Asher and Sherwood was signed.  The purchase price for Asher was $2 million ($2,000,000).  Asher shareholders were to receive their *pro rata* share of Sherwood common stock equal to $1.75 million, based on the fair market value of Sherwood stock as of February 14, 2002 and warrants to acquire such number of Sherwood shares as would have a fair market value of $250,000 on  February 14, 2002.  After the execution of this Agreement, Asher became a subsidiary of Sherwood and, from that time forward, Asher was under the control of Sherwood, including all of the financial and operational aspects of the Asher business.  Leonard Levie was no longer associated with the Asher division of Sherwood, ceasing to be the Chairman of the Board of Asher.  James Spampinato became a Sherwood employee and continued to be involved in the day-to-day operations of the Asher division of Sherwood as General Manager of the Asher plant.  Leonard Levie did not sign the Merger Agreement.  Only the shareholders of Asher signed the agreement.

The Merger Agreement contained the following relevant provisions:

> 3.10 Inspections.  The Purchaser is an informed and sophisticated participant in the transactions contemplated herein, and has engaged advisors, experienced in the evaluation and purchase of enterprises such as the Corporation.  The Purchaser has undertaken an investigation and has been provided with, has evaluated and has relied upon certain documents and information to assist the Purchaser in making an informed and intelligent decision with respect to the execution of this Agreement and the

agreements contemplated hereby.  The Purchaser will undertake prior to the Effective
Time such further investigation and request such additional documents and information
as it deems necessary.  The Purchaser acknowledges that the Sellers have made no
representation or warranty as to the prospects, financial or otherwise, of the Corporation,
upon which it relied.

6.1 <u>Survival</u>.   . . . all claims with respect thereto [to the Agreement] shall be
made prior to November 30, 2002 . . .

7.9 <u>Entire Agreement</u>.  The Agreement, including the schedules and exhibits
hereto and the documents, certificates and instruments referred to herein, embodies the
entire agreement and understanding of the parties hereto in respect of the transactions
contemplated by this Agreement and supersedes all prior agreements, representations,
warranties, promises, covenants, arrangements, communications and understandings, oral
or written, express or implied, between the parties with respect to such transactions.
There are no agreements, representations, warranties, promises, covenants, arrangements
or understandings between the parties with respect to such transactions, other than those
expressly set forth or referred to herein.

2.31 <u>Disclosure</u>.  Neither this Agreement nor any of the exhibits, attachments,
written statements, documents, certificates or other items prepared for or supplied to
Purchaser by or on behalf of the Corporation or the Sellers with respect to the
transactions contemplated hereby contains any untrue statement of a material fact or
omits a material fact necessary to make each statement contained herein or therein not
misleading.  There is no fact which the Sellers or the Corporation has not disclosed to
Purchaser herein and of which the Sellers or the Corporation, or any of their respective
officers, directors or executive employees is aware and which could reasonably be
anticipated to have a Material Adverse Effect on the Corporation or the ability of
Purchaser to continue the business of the Corporation in the same manner as the
Corporation conducted its business prior to the Closing Date.  The Corporation has
disclosed to Purchaser all material information relating to the business of the Corporation
or the transactions contemplated by this Agreement.

Furthermore, according to Section 1.11 of the Merger Agreement, 108,224 Sherwood

purchase price shares were placed in escrow.  These shares had a value of $700,000.  These

shares, frequently referred to as the "Hold Back Shares", were placed in escrow as security for

the post-closing adjustments and the indemnification obligations of the Sellers.

D.  <u>Post-Merger:  Sherwood's Claimed Discovery of Misrepresented & Omitted Items</u>

Approximately two months after the Merger Agreement was executed, in mid-June of

2002, Sherwood noticed a rise in Asher's accounts payable.  Apparently, this increase resulted from Asher failing to properly enter payables or invoices into its computer system.  As a result, once these invoices were entered, Asher's accounts payable increased.  Around this time, Sherwood also sent letters to vendors asking whether Asher had any outstanding obligations.  As a result of the additional information from vendors and the invoices already in Asher's possession, by November 2002, Sherwood determined that Asher had an additional $188,486 in accounts payable.  (Pl.'s Ex. 22).  In January 2003, Sherwood also realized that accounts receivable would decrease by about $67,000 due to customer deductions related to quality issues. (Pl.'s Ex 21.)  While Sherwood had performed some due diligence related to Asher's inventory, such as traveling to New Jersey to look at Asher inventory, no one from Sherwood asked about quality issues.

   Post-merger additional information came to light.  Sherwood learned that Asher had underpaid payroll taxes by about $20,000 as a result of incorrectly prepared 941 filings.  (Pl.'s Ex. 29)  Asher provided Sherwood with its payroll filings, but Sherwood apparently could not discover the under payments from the face of these documents.  In addition, in June 2002, Sherwood discovered that the company operated by Leonard Levie, AIAC, paid for some of Asher's health care premiums for its workers in March 2002.  (Defs.' Ex. 52 .)  Leonard Levie contacted Willi seeking repayment by Sherwood of a loan in the amount of approximately $51,000.  Willi disagreed that this payment was a loan, but instead thought that it should be treated as a cash infusion.  Furthermore, Sherwood contended at trial that the following items, among others, were not disclosed prior to the execution of the Merger Agreement:  Asher employees' 401Ks were not fully funded; outstanding fees and costs were owed on an

environmental study; various taxes were owed, such as unemployment and use taxes; and Asher's payment of a monthly $1,600 security deposit to its landlord was required.  (*See* Pl.'s Ex. 62)

Christopher Willi, however, conceded that Sherwood did not have to close this transaction on April 25, 2002, but it chose to do so based on the amount of due diligence it had completed up to that date.  Uziel Frydman explained that the time to close the merger needed to be fast, within one month to six weeks, because of production issues related to the seasonal candy cane business.  He explained that the deal could not drag two to three months because then two companies would essentially be running Asher and that situation would be unworkable. Willi acknowledged that no one at Asher ever refused to provide information to him related to his due diligence efforts.  For example, Willi indicated that when he spoke with Carl Schetzel, Asher's Controller, he answered any questions to the best of his ability and never refused to provide information and documentation.[3]  Sherwood, in fact, did receive accounts payable aging schedules and financial statements from 1997-2001, both unaudited and audited.  To the extent there were any gaps in information, Willi, or other Sherwood representatives, asked questions of Asher employees.

Although it is customary to ask a target company for a consent letter to provide to outside entities, such as vendors and customers, so that those entities will feel comfortable providing information to the acquiring company, Sherwood did not ask Asher for such a letter.  Willi did

---

[3] In addition, there is no evidence that certain documents received by Asher from Wells Fargo or sent to Wells Fargo from Asher were intentionally concealed from Sherwood.  Similar to other third parties doing business with Asher, Sherwood acknowledged that it could have sought access to such third parties by way of a letter of consent from Asher indicating that it was allowing the third party to share information with Sherwood.

not deny that Sherwood could have asked for such a letter, but indicated that it simply chose not to do so.  Instead, Sherwood chose to send out letters to vendors post-closing requesting information about Asher accounts.  Furthermore, even though Willi was aware that such letters could be sent, Sherwood did not send a letter to the Internal Revenue Service ("IRS") and the New York State tax authority, or ask Asher to send such a letter, to request information about Asher's payment of taxes.  In addition, Willi explained that, prior to closing, the IRS had not yet communicated to Asher that there was an incorrect tax calculation.  Willi also acknowledged that the due diligence conducted by Sherwood's Human Resource department should have uncovered Asher's 401K funding issue.  Sherwood determined that it was comfortable to close the transaction based on the information it received and proceeded to closing in April 2002.  Willi further conceded that all of the misrepresentations allegedly made by Defendants could have been discovered by Sherwood prior to closing, except the IRS recalculation of which no one had any knowledge until post-closing.

On July 12, 2002, a few months after the Merger Agreement was executed, but prior to the Purchase Price Adjustment Agreement being completed, as discussed below, Spampinato sent an e-mail to Willi outlining a number of issues concerning the integration of Asher and Sherwood.  (Defs.' Ex. 42b at Spampinato II 194.)  In the e-mail Spampinato explains that Asher is not currently paying payroll taxes and that previous filings were rejected for lack of sufficient funds.  There is a reference to Spampinato previously sending notice to Willi concerning this problem.  The e-mail explains that a number of vendor checks were also returned for insufficient funds.  Spampinato also notes payments due to the New York State Department of Taxation and Finance.  There is a reference to ongoing problems with the employee payroll system, which

14

likely relates to 401K funding issues.  Lastly, Spampinato reminds Willi that Asher's medical insurance expires at the end of the month and is in need of renewal.

Despite these issues, in the end of October 2002, Sherwood reported to its outside auditors that there had been no fraud involving management or employees having significant roles in internal controls and no fraud involving others that could have a material effect on financial statements.  (Defs.' Ex. 48c at BOO 611-619.)  Furthermore, a month later, in November 2002 no claims pertaining to representations and warranties, or indemnification were made, and no Notice of Escrow Claim was given by Sherwood before the November 30, 2002 deadline outlined in the Merger Agreement.  (Defs.' Ex. 43BB.)  Counsel for Sherwood, Gary Epstein, sent a letter to Uziel Frydman and Christopher Willi expressing his understanding that "a settlement had been reached."  (Defs.' Ex. 43BB.)  The letter further confirms that as a result of Sherwood not being able to quantify any claim, the escrow agreement expired without a claim being made.  (Defs.' Ex. 43BB.)  In fact, the escrow agent released all the escrowed Sherwood shares to the Sellers, however, the Sellers returned these shares to Sherwood to hold.

In addition, there is evidence that Sherwood was having certain problems completely unrelated to Asher during this same time period.  For example, a Sherwood press release issued June 17, 2002, reported a decline in revenue for the first nine months of fiscal year 2002.  (Defs.' Ex. 48d.)  The less than expected results were attributed to general economic conditions and delayed shipments to certain customers.  (*See id.*)  In the fall of 2002, around the time the Purchase Price Adjustment Agreement, discussed below, was being drafted, Uziel Frydman explained that Sherwood was facing serious issues impacting its business as a result of a port strike that lasted two months.  These issues were also reported in a 10-Q, a quarterly form

15

submitted to the Securities Exchange Commission ("SEC"), which was filed by Sherwood in December of 2002.

E.  The Purchase Price Adjustment Agreement

Section 1.10 of the Merger Agreement contemplated a later Purchase Price Adjustment Agreement ("PPAA"), which would include a closing date balance sheet that would determine any financial adjustments.  The Merger Agreement contained an estimated balance sheet which calculated an estimated net worth for Asher of $123,000.  The purchase price was to be adjusted based on any differences between the estimated net worth and the closing net worth.  Section 1.10 states that a "representative of the Purchaser and a representative of the Sellers shall work together to prepare and deliver a balance sheet of the Corporation (the "Closing Date Balance Sheet") and a calculation of the Closing Date Net Worth."  This process was supposed to be completed in 15 days.

Post-merger, the parties engaged in a substantial period of negotiation to settle certain disputes and to modify the Merger Agreement, which resulted in the parties' entry into the PPAA, which was not fully executed until February 2003.  The PPAA addressed $500,000 worth of the $700,000 of the escrow shares.  Sherwood received $200,000, the Asher shareholders, the Sellers, received $300,000, and $200,000 remained in escrow.  The escrow shares were supposed to be used first to address any purchase price adjustments and, in this case, the escrow shares were sufficient to cover the adjustments from the balance sheet attached to the PPAA.

While, a closing balance sheet was attached to the PPAA, it was not an audited balance sheet.  Instead, the balance sheet was created by agreement of the parties after a period of negotiation.  The complaints lodged by Sherwood post-closing were covered by various line item

entries on this balance sheet.  Christopher Willi was heavily involved in this process, but Uziel Frydman was not involved in the balance sheet aspect of the PPAA.  Although the creation of this balance sheet, to determine which side was to receive additional money, was supposed to take 15 days, the process took approximately 6 months.  The balance sheet was created to adjust the purchase price Sherwood paid for Asher.  Willi and Meyers agreed to a post-closing balance sheet on November 3, 2002.  Amir Frydman, on behalf of Sherwood, signed the PPAA on or about January 14, 2003.  (Defs.' Ex. 61.)  On that same day, a fax was sent to Sherwood's counsel by Christopher Willi sending the executed PPAA and instructing counsel not to send the executed PPAA to Asher "until we have complete sign off from the Asher shareholders."  (Defs.' Ex. 61.)  In addition, Uziel Frydman testified that around this same time period, in December 2002 to January 2003, he contacted counsel for advice surrounding concerns that Sherwood had overpaid for Asher given some of the information that it had learned about Asher's operations.  Nonetheless, the PPAA was signed by Sherwood in January and, for reasons that are unclear, Sherwood wanted to delay sending its executed portion of the PPAA to Asher.  Indeed, it was not until February 6, 2003 that the last Asher shareholder signed the PPAA.  (Pl.'s Ex. 7.)

   F.  The Asher Seller's Put Rights Under the Merger Agreement & Sherwood's Filing of
       this Lawsuit

In addition to the previously addressed sections of the Merger Agreement relevant to this action, Section 4.3 of the Merger Agreement, providing the Asher shareholders (also referred to as the "Sellers"), with a "put right", is also relevant to the counterclaims in this action.[4]  The put right outlined in Section 4.3 was to assure liquidity in the Sherwood stock that the Sellers would

---

[4]  The issue of the put right only relates to Eleanor Levie, as Sherwood settled with all other Sellers prior to trial.

be receiving as consideration for the sale and it acted as a hedge on the price of Sherwood's stock. This provision of the Merger Agreement provided that on the one year anniversary of the Merger Agreement (April 25, 2003), if Sherwood's stock went below $4.50, Sherwood would buy back ½ of the Sellers' purchase price shares. The provision also discussed registration of the shares by Sherwood. If Sherwood's registration statement had not been declared effective by the Securities Exchange Commission ("SEC"), through no fault of the Sellers, six months after the date of the Merger Agreement, the put right would vest at that time, assuming the other conditions listed in Section 4.3 were satisfied. To facilitate the registration process, Sherwood sent out questionnaires to the Sellers on May 6, 2002 and Matthew Roseman, an attorney, assisted the Asher shareholders with completing these questionnaires, which were returned to Sherwood on June 25, 2002.

Sherwood, however, had not effectively registered the shares six months after the Merger Agreement was executed, even though it filed a Registration Statement with the SEC on July 5, 2002. On November 20, 2002, Matthew Roseman sent Sherwood a letter indicating that the Sellers were exercising their put rights, pursuant to Section 4.3 of the Merger Agreement. (Defs.' Ex. 45E at L0149.) In correspondence sent to Sherwood in December 2002 and February 2003, Matthew Roseman inquired about the status of the Sellers' notice of their intention to exercise their put rights. (Defs'. Ex. 45E.) In Gary Epstein's January 13, 2003 letter to Uziel Frydman and Christopher Willi he stated that Sherwood "had not been able to generate accounting responses to SEC inquires on a timely basis" and, as a result, Sherwood's Registration Statement, or S-3, was never declared effective by the SEC. (Defs.' Ex. 43BB.) Epstein goes on to explain that Willi advised him the previous week that Sherwood wants to take

18

the position that the delay in filing the Registration Statement and responding to the SEC resulted from the actions of the Sellers.  (Defs.' Ex. 43BB.)  Epstein advised that notice of this position should be sent to the Seller's counsel, Roseman, immediately.  (Defs.' Ex. 43BB.)

Sherwood, however, did not respond to Roseman's letters until February 24, 2003, later in the same month that the PPAA was completed.  In a letter from Sherwood's counsel, it was communicated that Sherwood would not be honoring the put right because it believed that registration had not occurred because of fault attributable to the Sellers.  (Defs.' Ex. 45E at L0137-38.)  In particular, the letter noted that the causes of the delay in registering the shares resulted from the Sellers having failed to fill out their questionnaires in a timely manner and as a result of the delay in Asher providing a closing date balance sheet.  (*See id.*)

Matthew Roseman had not previously been informed that any delay in Sherwood's application for registration was the result of timeliness issues relating to the Sellers returning their questionnaires.  Furthermore, he did not believe that the completion of the closing date balance sheet, which was negotiated by both parties, impacted the share registration process. Roseman informed counsel for Sherwood, on March 5, 2003, that he was not persuaded that Sherwood's failure to register the shares was due to the actions of the Sellers.  In fact, the Registration Statement filed by Sherwood with the SEC has never been declared effective. However, there appeared to be some confusion based on representations by Sherwood that the stock was in fact registered.  Christopher Willi, in an e-mail sent to Leonard Levie on July 15, 2005 indicated that the stock had been "registered" with the SEC.  (Pl.'s Ex. 45.)  In addition, an e-mail sent by counsel for Sherwood on August 7, 2002 to Matthew Roseman also indicated that the shares had been registered.  (Defs.' Ex. 45E at L0109.)  It is undisputed, however, that the

19

shares were never registered.

On April 24, 2003, a day before the Sellers' put rights undisputably became effective under the terms of the Merger Agreement, Sherwood filed this lawsuit.  On April 28, 2003, shortly after the year anniversary of the Merger Agreement, Roseman sent another letter to Sherwood informing the company that the Sellers were electing to exercise their put rights, in accordance with the terms of the Merger Agreement.  (Defs.' Ex. 45E at L0163.)  Around this same time, Roseman learned from James Spampinato that Sherwood filed the instant action. James Spampinato, who was a Sherwood employee at the time the suit was filed, was very upset about the allegations in Sherwood's Complaint.  Amir Frydman called Spampinato and left a voicemail message indicating the purpose for the filing of the lawsuit was so that Sherwood did not have to honor the exercise of the Sellers' put rights.  (Defs.' Ex. 41.)  Amir Frydman indicated that Sherwood believed its stock had dropped low enough to trigger the put right because Sherwood was defrauded into purchasing Asher.  As a result of its belief that it had been defrauded by Asher shareholders, Sherwood filed this action and would not honor the Sellers' put rights.

II.     Conclusions of Law

Sherwood's Three Count Complaint asserts the following causes of action: Count I, Maryland State Securities Fraud; Count II, Fraudulent Inducement; Count III, Declaratory Judgment and Injunctive Relief.  In Count I and Count II, Sherwood essentially alleges that Leonard Levie made misrepresentations in January 2002 and in Article II of the Merger Agreement.  (*See* Pl.'s Proposed Concl. of Law at p. 16.)  Furthermore, Plaintiff asserts that Leonard Levie made these misrepresentations maliciously, with actual knowledge of their falsity

and/or in reckless disregard of the truth, and that Sherwood justifiably relied on the misrepresentations.  (*See* Pl.'s Proposed Concl. of Law at p. 16-17.)  Count III alleges that Sherwood would not have signed Section 4.3 of the Merger Agreement, which outlines the Sellers' put rights, but for the Levies' fraud and misrepresentations.  Thus, Sherwood requests that this Court declare void Section 4.3 of the Merger Agreement establishing a "put right".  In particular, Sherwood asks that this Court declare that Sherwood is not required to buy back any Sherwood shares from Eleanor Levie and to enjoin Eleanor Levie from putting back any Sherwood common stock to Sherwood.

### A.     Count I - Maryland Securities Law Violation

Under § 11-703 of the Maryland Corporations and Association Code Annotated, a person is civilly liable to the person buying or selling from him for a securities fraud violation if:  (1) the defendant offers to sell or purchase, or sells or purchases, a security to the plaintiff; (2) by means of an untrue statement of material fact, or in light of the circumstances, by the omission of a material fact necessary to make the statements made not misleading; (3) where the plaintiff did not know the untruth or omission; and (4) where the defendant does not prove that he did not know, or could not have known of the untruth or omission in the exercise of reasonable care.[5] Md. Corps. & Assn's Code Ann. § 11-703(a)(1). (2005).

---

[5]  Section 11-703 (a)(1) reads in relevant part:

A person is civilly liable to the person buying a security from him if he:
... (ii) Offers or sells the security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and if he does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

21

"Maryland courts examine federal case law when interpreting state securities statutes which . . . are worded similarly to their federal counterparts." *See Moseman v. VanLeer,* 263 F.3d 129, 133 (4th Cir. 2001) *cert. denied*, 534 U.S. 1128 (2002); *see also Uhre v. Emmett A. Larkin Co., Inc.*, 205 F. Supp. 2d 475, 479 (D. Md. 2002); *Baker, Watts & Co. v. Miles & Stockbridge,* 95 Md. App. 145, 620 A.2d 356, 369-70 (Md. 1993) ("In reaching our decision, we are aided by federal court interpretations of sections of the federal securities acts that are similar to § 11-703(c)").  There is a dearth of case law addressing § 11-703, the Maryland securities fraud provision that specifically addressed "Civil liabilities."  Therefore, in applying this provision, this Court will consider the more fully developed body of case law addressing the federal securities antifraud provision.[6]

---

[6]  The first section under the subtitle "Fraudulent and Other Prohibited Practices" in the Maryland Securities Act, § 11-301, "Offers, sales, or purchases", mirrors the federal securities antifraud provision.  Section 11-301 states:

> It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:
>
> (1) Employ any device, scheme, or artifice to defraud;
>
> (2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person.

Md. Corps. & Assn's Code Ann. § 11-301.  Section 10(b) of the Securities Exchange Act of 1934, the federal securities antifraud provision, states:

> (a) Use of interstate commerce for purpose of fraud or deceit
>
> It shall be unlawful for any person in the offer or sale of any securities or any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

The Supreme Court has held that reliance is an element of a federal securities fraud

claim.

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 178 (1994)

(stating that in its earlier decision, *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme

Court "decided that a plaintiff in a 10b-5 action must prove that he relied on the defendant's

misrepresentation in order to recover damages.").  In finding that reliance is an essential element

to a federal securities fraud claim, the Court stated that "[r]eliance provides the requisite causal

connection between a defendant's misrepresentation and a plaintiff's injury."  *Basic Inc. v.*

*Levinson*, 485 U.S. 224, 243 (1988).[7]  Given the many similarities between Maryland's securities

antifraud provision and the federal antifraud provision, to be successful on its Maryland

---

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.

[7]  In certain circumstances, namely in cases involving a defendant's omission to disclose material information, the plaintiff may be entitled to a reputable presumption of reliance.  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972) ("Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.").  In the instant action, Sherwood alleges that Leonard Levie made "false statements and/or omissions".  (Compl. ¶ 55.)  In particular, Sherwood asserts that Leonard Levie made "misrepresentations of material fact in January 2002 and in Article II of the Agreement and Plan of Merger."  (*See* Pl.'s Proposed Concl. of Law at p. 16.)  Based on Sherwood's allegations and the facts presented in this case it is not entitled to a presumption of reliance.  *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1028 n.13 (4th Cir. 1997) (quoting *Cox v. Collins*, 7 F.3d 394, 395-96 (4th Cir.1993)) ("No presumption of reliance exists, however, 'when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure.'").

securities fraud claim Sherwood must show that it justifiably relied on the alleged false statements made by Leonard Levie during the course of merger negotiations.[8]  *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1028 (4th Cir. 1997) ("A plaintiff's failure to prove that it justifiably relied on a broker's alleged omission or misstatement is necessarily fatal to a securities fraud claim."); *see also Straub v. Vaisman and Co., Inc.,* 540 F.2d 591, 597-98 (3d Cir. 1976) (noting that "the 'reasonable reliance' element of a Rule 10b-5 claim requires a showing of a causal nexus between the misrepresentation and the plaintiff's injury . . . .").

Sherwood is a sophisticated entity that, prior to the Asher merger, had experience in complex business transactions.  Prior to sending its first letter of intent to Asher, only a few days after its initial meeting with Leonard Levie and James Spampinato, Sherwood was clearly aware that Asher was a company facing financial difficulties.  Furthermore, this merger was an arms-length transaction.  There is no evidence that Asher and Sherwood had any prior business relationship or that the parties involved in the deal had a personal relationship warranting trust.  While the absence of such a relationship does not permit false statements that violate the law, it does indicate that Sherwood would be expected to have a healthy scepticism concerning the information it received from Asher.  Indeed, Willi explained that Sherwood wanted to learn as much information as possible during the due diligence process.  To this end, Asher provided access to relevant information and there is no evidence that Asher refused to provide information

---

[8]  Sherwood also contends that Leonard Levie made false statements in Article II of the Merger Agreement.  (*See* Pl.'s Proposed Concl. of Law at p. 16.)  Leonard Levie, who was not a shareholder of Asher, did not sign the Merger Agreement.  As a result, Sherwood could not have justifiably relied on any false statements made by Leonard Levie in the Merger Agreement, as Sherwood has not shown that any of the statements in the Merger Agreement can be appropriately attributed to him.

24

to conceal the alleged fraud.  Willi testified that Sherwood could have learned of all of the items[9]

now complained of in this lawsuit by conducting some additional due diligence.  Indeed,

Sherwood sought an expedited closing for this transaction.

 In addition, to the extent that Leonard Levie made any projections about Asher's future

performance, such as projecting a profit for Asher for 2002, or expressed general opinions

concerning potential synergies that may result from a merger between the two companies, it was

unreasonable for Sherwood to rely on such predictions.  The United States Court of Appeals for

the Fourth Circuit has noted that "projections of future performance not worded as guarantees

are generally not actionable under the federal securities laws."  *See Raab v. General Physics*

*Corp.,* 4 F.3d 286, 290 (4th Cir. 1993) (internal citations and quotations omitted); *see also In re*

*Royal Ahold N.V. Securities & ERISA Litig.*, 351 F. Supp. 2d 334, 371 (D. Md. 2004).  When

Leonard Levie met with representatives from Sherwood in January 2002 he was trying to sell

Asher to Sherwood.  It is generally not reasonable for sophisticated business-people to simply

rely on the type of puffery that typically occurs during a sales pitch.

 "A dissatisfied investor cannot recover for a poor investment on the basis of an . . .

alleged omission or misstatement where, 'through minimal diligence, the investor should have

discovered the truth.'"  *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1027

-28 (4th Cir. 1997) (quoting *Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1032 (2d Cir.

1993)).  Indeed, the securities fraud laws cannot be an insurance policy for cases where a

sophisticated business entity comes to believe, post-closing, that it has paid to much for another

---

[9]  The one exception was the IRS recalculation because the IRS had yet to notify Asher of
its decision by the time the merger transaction closed.

company.  This is especially the case where, as here, the purchaser was afforded the opportunity

for due diligence and the information could have been ascertained prior to the close of the

transaction.  Sherwood also had the opportunity, by the terms of the Merger Agreement, to make

claims against shares held in escrow.  In addition, through the PPAA, Sherwood had the ability

to address the vast majority of the items it discovered post-closing.  In fact, Sherwood did

address the $51,000 payment to AIAC, Leonard Levie's company, that it now alleges was a

material omission entitling it to a finding of fraud by this Court.

>    The United States Court of Appeals for the Fourth Circuit has stated that an aggrieved

investor's reliance on an omission or misstatement is *never* justified when the investor's conduct

rises to the level of recklessness.  *See Banca Cremi, S.A.*,132 F.3d at 1028 (internal quotation

and citation omitted).[10]  The Fourth Circuit explained that "[a] plaintiff is reckless if he

intentionally refuses to investigate in disregard of a risk known to him or so obvious that he must

be taken to have been aware of it, and so great as to make it highly probable that harm would

follow."  *Id.* (internal quotation and citation omitted).  Basically, a plaintiff cannot "close his

eyes to a known risk."  *See id.*  (quoting *Teamsters Local 282 Pension Trust Fund v. Angelos,*

762 F.2d 522, 530 (7th Cir. 1985)).

>    Sherwood knew that Asher was a company facing financial difficulties.  With this

knowledge, Sherwood assessed the risk associated with the deal and made a calculated decision

about the level of due diligence it wanted to conduct prior to closing the merger transaction and

completing the PPAA.  Willi indicated that, prior to closing, Sherwood did not receive all of the

---

[10]  The Fourth Circuit has not foreclosed the possibility that a purchaser's negligence
precludes reasonable reliance.

information it requested in its due diligence checklist.  Willi acknowledged that Sherwood could

have done additional due diligence to follow up on various items, including receiving

information from third party sources outside of Asher.  Sherwood, nonetheless, closed the

transaction on April 25, 2002 without additional investigation.  Based on the facts of this case,

Sherwood could not have reasonably relied on any of the alleged false statements or omissions.[11]

Therefore, Sherwood's securities fraud claim fails and judgment shall be entered in favor of

Defendant Leonard Levie and against Plaintiff Sherwood on Count I.

      B.    <u>Count II - Fraudulent Inducement</u>

      Under Maryland law, to prevail on a claim for fraudulent inducement a plaintiff must

show:  (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was

either known to the defendant or that the representation was made with reckless indifference as

to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff;

(4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that

the plaintiff suffered compensable injury resulting from the misrepresentation.  *See Maryland*

*Environmental Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (Md. 2002) (citing *VF Corp.*

*v. Wrexham Aviation Corp.*, 350 Md. 693, 703, 715 A.2d 188, 192-93 (Md. 1998)).  Sherwood

must prove each of these elements by clear and convincing evidence.  *See VF Corp.*, 350 Md. at

704, 715 A.2d at 193.

---

    [11]  Leonard Levie was not a shareholder of Asher and, therefore, did not sell any Asher shares as part of the merger transaction.  As a result, Leonard Levie can only be liable under § 11-703(a)(1) if he is deemed a control person under § 11-703 (c)(1).  Both parties briefed and presented argument on the issue of whether Leonard Levie can be considered a control person under § 11-703 (c)(1).  This Court, however, will not address this somewhat  novel issue regarding control person liability under the Maryland securities laws given this Court's finding that Sherwood does not have a viable securities fraud claim.

Count II of Sherwood's Complaint fails for the same reasons as Count I.  For the reasons explained above, Sherwood cannot show  that it had the right to rely on any of the alleged misrepresentations made by Leonard Levie.  Furthermore, Plaintiff failed to show by clear and convincing evidence that any of the alleged misrepresentations or omissions were made or withheld by Leonard Levie with the requisite deliberate intent to deceive.  *See VF Corp.*, 350 Md. at 704, 715 A.2d at 193 (noting that the Maryland Court of Appeals has stated in several of its decisions that "recovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive.") (internal quotation and citation omitted).  As a director of Asher, it was not unreasonable for Leonard Levie to be unaware of the majority of the day-to-day operational items, such as accounts payable agings, that Sherwood alleges were falsely represented to it prior to the closing of the merger.  The Court is not persuaded that Leonard Levie was involved in the operational minutia of running Asher, nor, based on the facts presented, that his lack of awareness of certain matters amounted to reckless indifference.[12] Therefore, Sherwood's fraudulent inducement claim fails and judgment shall be entered in favor of Defendant Leonard Levie and against Plaintiff Sherwood on Count II.

C.     Count III - Declaratory Judgment and Injunctive Relief

As previously stated, Count III of Sherwood's Complaint asks this Court to declare void Section 4.3 of the Merger Agreement, as it relates to Eleanor Levie's put right.  In addition,

---

[12]  There is no dispute that Leonard Levie knew of the AIAC $51,000 loan to Asher on March 21, 2002.  (Defs.' Ex. 52.)  However, there is no evidence that Leonard Levie withheld this information with a deliberate intent to deceive.  In contrast, he wanted this obligation to be repaid to AIAC and, in fact, the PPAA specifically addressed its repayment.  In addition, the alleged failure to disclose a $51,000 loan in a transaction of this size is immaterial.  An undisclosed loan of this amount cannot be said to have caused the plaintiff compensable injury, especially when Sherwood agreed to repay the full amount in the PPAA.

Sherwood requests that this Court enjoin Eleanor Levie from "putting" half of her purchase price shares back to Sherwood.  Sherwood asserts that it would not have signed Section 4.3 of the Merger Agreement, but for the Levies' fraud and misrepresentations.  As a result of this Court's ruling, that Sherwood has no actionable claim for securities fraud or fraudulent inducement, there is no basis for entering either the declaratory or injunctive relief requested in Count III.  Therefore, judgment shall be entered in favor of Defendant Leonard Levie and Defendant Eleanor Levie and against Plaintiff Sherwood on Count III.

   D. <u>Leonard Levie's Counterclaim - Breach of Contract</u>

   Count I of the Levies' Counterclaim is for breach of contract.  More specifically, Leonard Levie contends that Sherwood failed to repay a $51,000 loan made by a company operated by Leonard Levie - American Industrial Acquisition Corp ("AIAC").  AIAC is not a counterplaintiff.  The promise to repay this loan was contained in the February 3, 2003 PPAA executed by Sherwood and the Asher shareholders.  Neither Leonard Levie nor AIAC were parties to the PPAA.

   Leonard Levie has failed to establish that he is a third party beneficiary to the PPAA because he has not provided evidence that the parties to the PPAA intended for Sherwood to repay the $51,000 to him.  The third party beneficiary theory of recovery is a "limited exception" to the strict privity rule of contracts.  *See Flaherty v. Weinberg*, 303 Md. 116, 129, 492 A.2d 618, 624 (Md. 1985).  "In general terms, a third party beneficiary contract arises when two parties enter into an agreement with the intent to confer a direct benefit on a third party, allowing the third party to sue on the contract despite the lack of privity."  *Id.* at 125, 622.  The third party must show that he is "a part of the class of persons specifically intended to be beneficiaries of the

defendant's undertaking." *Shofer v. Stuart Hack Co.*, 124 Md. App. 516, 529, 723 A.2d 481, 487 (Md. Ct. Spec. App. 1999) (internal citations omitted).

"[T]he intention of the contract, revealed by its terms, in the light of the surrounding circumstances is the controlling determinative" to whether or not a party is a third party beneficiary. *Hamilton & Spiegel, Inc. v. Bd. of Ed. of Montgomery County*, 233 Md. 196, 199, 195 A.2d 710, 711 (Md. 1963).[13] Here, the PPAA's language does not contemplate Levie as a beneficiary. The relevant provision states:

> Accounts Receivable. Sherwood shall pay American Industrial Acquisition Corporation ("AIAC") the sum of $51,000.00 in full satisfaction of any amounts owing or payable to AIAC or its affiliates, against receipt of an unconditional and absolute release of claims against Sherwood, the Corporation and the Shareholders executed by AIAC, in the form attached hereto as Exhibit B.

(Pl.'s Ex. 7.) This provision clearly establishes AIAC as the only third party contemplated by Asher and Sherwood. AIAC is the logical beneficiary since AIAC -- not Levie -- made the $51,000 loan by paying health care premium payments for Asher employees. (*See* Defs.' Ex. 52.) Levie, therefore, fails to establish that he is a third party beneficiary based on the terms of the PPAA.[14]

---

[13] Further, "[t]he primary source for determining whether the parties intended a third party to have standing to enforce the contractual provisions is the language of the contract itself." *Volcjak v. Washington County Hosp. Ass'n*, 124 Md. App. 481, 509, 723 A.2d 463, 477 (Md. Ct. Spec. App. 1999).

[14] *See Bacx Corp. v. Martin Marietta Materials, Inc.*, 1999 WL 33955337 *4 (D. Md. 1999). The plaintiff in that case, a creditor to a company being purchased, recovered as a third party beneficiary based on the terms of an asset purchase agreement (APA) which explicitly provided for compensation to third-party creditors from accounts receivable in excess of a set threshold amount. *Id.* Those terms established an intent by the APA parties to benefit third party creditors, including plaintiff. *Id.* In contrast, Levie is not mentioned by name or by title in the PPAA, and the relevant provision explicitly names AIAC as beneficiary of the $51,000 at

Without being named in the PPAA's provision regarding the $51,000 loan, Levie would need to show that the "surrounding circumstances" establish that Asher and Sherwood intended for him to benefit from that provision.  *See Hamilton*, 233 Md. At 199, 195 A.2d at 711.  "It is not sufficient that the contract may operate to his benefit."  *Volcjak v. Washington County Hosp. Ass'n*, 124 Md. App. 481, 509, 723 A.2d 463, 477 (Md. Ct. Spec. App. 1999).  Levie has provided no evidence of circumstances revealing that the signatories of the PPAA intended for him to benefit from the contract.  Therefore, he fails to establish himself as a third party beneficiary and has no claim to the $51,000 repayment of AIAC's loan.  As a result, this Court will enter judgment in favor of Counterdefendant Sherwood and against Counterplaintiff Leonard Levie as to the breach of contract Counterclaim (Count I) contained in the Countercomplaint filed on June 3, 2003.[15]

    E.    <u>Eleanor Levie's Counterclaims</u>

        1.    <u>Count I - Breach of Contract Regarding her Put Right and Count III - Specific Performance Regarding her Put Right</u>

Section 4.3 of the Merger Agreement provided the Sellers, those selling Asher stock to Sherwood, with a "put right."  Section 4.3 of the Merger Agreement states:

> For a period of thirty (30) days commencing on the one-year anniversary of the date hereof, each Seller shall have the right to sell to Purchaser one-half of the Purchase Price

issue.

[15]  Post-trial, counsel for Counterplaintiffs, perhaps sensing the outcome of Leonard Levie's counterclaim, endeavor to have Eleanor Levie, as a counterplaintiff, pursue the repayment of the $51,000 under a specific performance claim (Count III).  This position, however, was not taken at trial where counsel pursued this claim on behalf of Leonard Levie, as his sole counterclaim against Sherwood.  Therefore, the post-trial argument that Eleanor Levie is pursuing this claim is not supported by the record and will not be considered by this Court at this late date.

Shares issued to him/it on the date hereof at a price of $4.50 per share (the "Put Right"); provided, however, that such Put Right shall only be exercisable if and when (a) the prior day's closing price for the Sherwood Common Stock on the American Stock Exchange was below $4.50 per share, and (b) the Fair Market Value of the Sherwood Common Stock is $4.50 or less, measured from the date of exercise.  If the registration statement described in Section 4.2 has not been declared effective, through no fault of the Sellers (whether such fault be the result of actions or the failure to act), by the date that is six months after the date hereof, the Put Right shall commence on the date that is six months from the date hereof.

The Purchase Price Shares are defined in Section 1.3 of the Merger Agreement, in relevant part, as follows: "Purchase shall issue in the name of the Sellers (i) such number of shares of Class A common stock, $.01 par value, of Sherwood Brands, Inc. (the "Sherwood Common Stock") as shall equal a Fair Market Value as of February 14, 2002 (the "February 14 FMV") of $1.75 million, subject to the adjustments in Section 1.10 (the "Purchase Price Shares")."  On the date the Merger Transaction closed, 148,808 shares of Sherwood stock were registered in Eleanor Levie's name.  (Pl.'s Ex. 2-A at tab 6.)  Pursuant to the PPAA, 17,007 of Eleanor Levie's Sherwood Brand shares were returned to the Sherwood.  As a result, Eleanor Levie received 131,801 Purchase Price Shares.  According to Section 4.3, half of the Purchase Price Shares are subject to the put right, exercisable at a price of $4.50 per share.  If Sherwood had honored Eleanor Levie's put right, she would have received $296,552.25 ((131,801÷2) x $4.50 = $296,552.25).

As previously discussed, Sherwood did not honor Eleanor Levie's put right, in part, because it attributed its failure to have an effective registration statement six months after closing to the Sellers.  However, under Section 4.3 such a failure to register the shares simply does not affect the vesting of the put right afforded to the Sellers at the one year anniversary of the

Merger, which has since passed.[16]  Therefore, if the conditions of Section 4.3 were met on the year anniversary, Eleanor Levie would be entitled to exercise her put right.

Sherwood next argues that the Sellers are not entitled to exercise the put right because they could have sold their Sherwood stock on the open market pursuant to SEC Rule 144.  This argument is a non-sequitur.  The Merger Agreement was a negotiated contract between Sherwood and the Sellers.  As part of the Agreement, in part as a hedge, the Asher Sellers negotiated the put right entitling them to put back a pre-determined amount of their Purchase Price Shares to Sherwood on a specific date and at a specific price.  Sherwood is contractually obligated to honor Section 4.3 of the Merger Agreement.  Sherwood's failure to honor this contractual obligation is a breach and Eleanor Levie is entitled to specific performance, which will result in Sherwood owing Eleanor Levie $296,552.25 upon exercise of her put right. Therefore, judgment is entered in favor of Counterplaintiff Eleanor Levie and against Counterdefendant Sherwood on Count I and Count III of her Countercomplaint filed on June 3, 2003, as it relates to her put rights.

---

[16]  Furthermore, this Court does not find Sherwood's position attributing fault to the Sellers credible and the Sellers put should have vested at the six month point.  However, any interest owed to Eleanor Levie will be calculated from the year anniversary of the closing of the merger, as it is abundantly clear that her put right was fully vested by that date.  In diversity cases, a federal court will apply the appropriate state law to determine pre-judgment interest. *See Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999); *Environmental Elements Corp. v. Mayer Pollock Steel Corp.*, 497 F. Supp. 58, 64 (D. Md. 1980). Therefore, this Court will apply Maryland's legal rate of interest of 6% per annum, simple interest, as the pre-judgment interest rate because there does not appear to be a pre-set interest rate in the Merger Agreement.  *See Crystal v. West & Callahan, Inc.*, 328 Md. 318, 342, 614 A.2d 560, 572 (Md. 1992) ("Absent statute, the legal rate of prejudgment interest is equal to the general legal rate of six percent."); *see also* Md. Code. Ann., Com. Law. I, § 12-102 (noting the general legal rate of interest is simple interest of 6% per annum).

2.      Count I - Breach of Contract Regarding Adjustment of Purchase Price from PPAA and Count III -Specific Performance Regarding Adjustment of Purchase Price from PPAA

Eleanor Levie asserts that she is entitled to an additional $113,538.17 in cash in accordance with a term in both the Merger Agreement and the PPAA addressing Asher's accounts payable obligations.  Post-merger, Sherwood was able to successfully obtain a reduction in the amount of money owed by Asher to outside parties.  Eleanor Levie claims that she is entitled to a portion of this savings, but Sherwood has failed to pay her.  More specifically, she asserts that she is entitled to $113,538.17 in compensatory damages as a result of Sherwood's post-merger success in negotiating for a reduction in the amount of Asher's accounts payables.  Section 1.10 of the Merger Agreement states, in relevant part:

> For a period of three months after the Closing Date, Jim Spampinato and Christopher Willi, acting jointly for the benefit of the Surviving Corporation, shall assist the Surviving Corporation in the management of the Closing Date accounts payable and accrued expenses."  In the event that such items are satisfied by the Surviving Corporation at less than the face value thereof, then the difference between the amounts payable and the amounts paid shall serve as an upward adjustment to the Purchase Price and shall be paid to the Sellers as promptly as reasonably practicable after November 30, 2002 *in shares of Sherwood Common Stock*, valued at the February 14 FMV.

(Pl.'s Ex. 2-A) (emphasis added.)  Paragraph 6 of the PPAA states:

> Sherwood will provide appropriate documentation, as soon as practicable after November 30, 2002, concerning any accounts payable and accrued expenses of the Corporation existing as of April 25, 2002 that were settled for an amount less than face value thereof. The Shareholders shall be entitled to a dollar for dollar upward adjustment on the Purchase Price under the Merger Agreement of the amount of the difference between the face value of such accounts payable and the amounts actually paid in respect thereof to be paid *in the form of additional shares of Common Stock* as set forth in the Merger Agreement.

(Pl.'s Ex. 7) (emphasis added.)

Sherwood received a total savings of $206.433.04 as a result of compromises on accounts

34

payable.  (Defs.' Ex. 39d at Sherwood's Ans. #15.)  The date Sherwood completed this process

was not identified in the record, nor did Eleanor Levie assert that she reasonably should have

been paid by a certain date.

Eleanor Levie was a 55% shareholder of Asher and, therefore, would have been entitled

to Sherwood *stock* valued at $113,538.17, or 55% of $206.433.04.  As noted above, both the

Merger Agreement and the PPAA contemplated payment of the purchase price adjustment to the

Sellers in shares of "Sherwood Common Stock", valued at the "February 14 FMV" -- a defined

term in the Merger Agreement, referring to the fair market value ("FMV") of Sherwood common

stock, which was valued at $6.4681 per share.  (Pl.'s Ex. 2-A at tabs 1, 6, 9, 11.)  Although

Eleanor Levie seeks compensatory damages, instead of Sherwood common stock shares as

outlined by the agreements, she presented no testimony or other evidence that she would have

sold those Sherwood shares upon their receipt.  Nor did she indicate what date she believes

would have been reasonable for her to have received the shares.

Based on Sherwood's breach of Section 1.10 of the Merger Agreement and Paragraph 6

of the PPAA, Eleanor Levie is entitled to specific performance as requested in her

Counterclaim, but not compensatory damages in the form of a cash payment of $113,538.17.

This Court finds that compensating  Eleanor Levie with a cash payment of $113,538.17 would be

speculative given the lack of information about dates crucial to determining such a damage

figure.[17]  Indeed, it is clear that the Sellers did not bargain for a cash payment equal to the

amount saved by Sherwood in negotiating concessions for Asher's outstanding obligations.

_____

[17]  As a result, if the requested compensatory damages were awarded this Court believes
that Eleanor Levie would receive a potential windfall, instead of providing her an amount that
would appropriately make her whole for Sherwood's breach.

Instead, the Sellers bargained for assuming a certain degree of risk that is associated with consideration in the form of common stock.  Therefore, Sherwood shall deliver 17,554 ($113,538.17÷$6.4681) shares of Sherwood Common Stock, the appropriate amount of shares, based on the "February 14 FMV" of $6.4681 per share, to Eleanor Levie within 10 days from the entry of judgment in this case in order to compensate her for the purchase price adjustment in the amount of $113,538.17.   Judgment is entered in favor of Counterplaintiff Eleanor Levie as to Count I and Count III and against Sherwood.

3.   Count I - Breach of Contract Regarding Registration Rights and Count IV - Securities Fraud

Counterplaintiff Eleanor Levie has failed to articulate, let alone prove, a cause of action related to her "registration rights" claim.  Eleanor Levie asks this court to find that Sherwood "breached its contractual obligations to Eleanor Levie . . . to file and make effective the Registration Statement on or before April 25, 2003, the one-year period from the date of the closing of the Merger Agreement, the effect of which was to preclude Eleanor Levie from selling her remaining 69,901 shares of Sherwood stock at the then share price of $2.25."  (Defs.' Proposed Concl. of Law at p. 12.)  Section 4.2 of the Merger Agreement states that Sherwood shall "*file* a registration statement covering the resale of the Purchase Price Shares and the shares of Sherwood Common Stock issuable upon exercise of the Warrants" with the SEC.  (Pl.'s Ex. 2-A) (emphasis added.)  The Merger Agreement then refers to terms and conditions set forth in the attached Registration Rights Agreement.  The Registration Rights Agreement states that Sherwood shall *file* a shelf registration statement with the SEC no later than 45 days after the close of the merger.  The Registration Rights Agreement further states that Sherwood "shall use its commercially reasonable efforts to have the Registration Statement declared effective within

36

ninety days" after the merger and keep the statement effective *until* one year after the merger.
(Pl.'s Ex. 2-A.)

First, Sherwood did *file* a registration statement even though it was never declared
effective by the SEC.  Second, Counterplaintiff presented no probative testimony concerning
whether Sherwood failed to "use its commercially reasonable efforts" to have the registration
statement become effective.  Third, Counterplaintiff has failed to identify what remedy, if any,
was provided for in the Registration Rights Agreement for a potential breach of that Agreement.

Furthermore, Eleanor Levie's contemplated damages of $157,277.25 is simply
unsupported by the evidence.  Although unclear, Eleanor Levie appears to assert that she is
entitled to damages resulting from her inability to sell 69,901 of her shares at a price of $2.25,
Sherwood's purported stock price on April 25, 2003.  There is no evidence indicating that April
25, 2003 is the appropriate date to utilize to make any damage calculation.[18]  In fact, after
holding Sherwood's stock for a year, Eleanor Levie was likely eligible to sell her shares under
SEC Rule 144.[19]  *See* SEC Rule 144, 17 C.F.R. § 230.144(d)-(f).  In simplified terms, SEC Rule
144 provides a "safe harbor" for resales in the public market of restricted securities without
registration under the Securities Act of 1933 after those restricted securities are held for a one-
year period.  *See id.*  Indeed, Rule 144 is discussed in the Registration Rights Agreement and
Sherwood, upon the request of a Seller, was required to assist the Seller by providing a written

---

[18]  While the put right outlined in Section 4.3 of the Merger Agreement was tied to April
25, 2003, the put right is completely irrelevant to the remaining ½ of Eleanor Levie's shares not
subject to that provision, which are the subject of her registration rights claim.

[19]  Counterplaintiff did not dispute that she was eligible to sell her Sherwood stock
pursuant to Rule 144.

statement indicating that certain requirements had been met.  There was no evidence that Eleanor

Levie ever requested for Sherwood to issue such a written statement in relation to a potential

Rule 144 sale.  Although defense counsel argued at trial that Eleanor Levie would have been

unable to utilize Rule 144 because no buyer would be interested in her stock as a result of the

taint caused by Sherwood's fraud allegations, there was no testimony for Eleanor Levie, who did

not testify at trial, or other evidence that she ever even attempted to sell her shares under Rule

144.

Therefore, judgment is entered against Counterplaintiff Eleanor Levie and in favor of

Counterdefendant Sherwood on Count I and Count IV of her Countercomplaint filed on June 3,

2003, as it relates to her "registration rights" claim.

### 4.  Count II - Accounting and Specific Performance

In light of the Court's ruling on Eleanor Levie's other counterclaims, Count II, seeking

Accounting and Specific Performance, is moot.

### 5.  Count IV - Securities Fraud and Counterdefendants Request for Punitive Damages

Eleanor Levie's Countercomplaint contends that Sherwood violated § 11-301 *et seq.*[20] of

the Maryland Securities Act by: (1) sending the February 24, 2003 letter from Sherwood's

counsel to her counsel, Matt Roseman, indicating that Sherwood would not honor the put

because of wrongdoing by the Sellers, and (2) by filing this lawsuit containing a false allegation

that she committed securities fraud.  (Defs.' Proposed Concl. of Law at p. 15.)  Counterplaintiff

fails to articulate or prove how these two alleged misstatements are actionable under the

---

[20] *See supra* at "Conclusions of Law" II.A. for a discussion of the Maryland Securities Act.

Maryland Securities Act.  Counterplaintiff argues that because of her lack of involvement in the day-to-day activities of Asher she did not know, or could not have known of the untruth or omission in the exercise of reasonable care of the above referenced alleged misstatements by Sherwood.  *See* Md. Corps. & Assn's Code Ann. § 11-703(a)(1).  It is nonsensical that Eleanor Levie did not know of the alleged falsity of these statements and there is no basis for her to have reasonably relied on these alleged misrepresentations.  Regardless of her level of involvement in Asher she certainly did not believe (1) that it was her fault that the put right was not honored by Sherwood or (2) that she had committed the allegations in Sherwood's Complaint.  Count IV of Eleanor Levie's Countercomplaint fails, as she has not proven that Sherwood violated Maryland's securities laws.

Post-trial Eleanor Levie also contends that the "allegations" contained in Count IV support a cause of action for common law constructive fraud.  (Defs.' Proposed Concl. of Law at p. 15.)  To state a claim for any type of fraud, Rule 9(b) of the Federal Rules of Civil Procedure requires the complaint to state the circumstances constituting fraud "with particularity."  *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999).  Accordingly, a description of "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby" is generally required. *Id.* (internal quotation omitted); *see also Harte-Hanks Direct Marketing/Baltimore, Inc. v. Varilease Tech. Fin. Group, Inc.*, 299 F. Supp. 2d 505, 525 (D. Md. 2004).  Indeed, a Complaint asserting any cause of action must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Slade v. Hampton Roads Regional Jail*, 407 F.3d 243, 252 (4th Cir.  2005) (citing *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).

There is no mention of a common law constructive fraud claim in Count IV of Eleanor

Levie's Countercomplaint, which refers specifically to the Maryland Securities Act.  Eleanor

Levie never moved to amend her complaint and this common law fraud claim was not addressed

during trial.  Indeed, the allegations in Count IV of Eleanor Levie's Countercomplaint do not

meet the requirements of Rule 9 and do not support a cause of action for common law

constructive fraud.  Furthermore, it would prejudice Counterdefendant to consider such a claim

post-trial, especially considering that Sherwood has had no opportunity to respond to this claim,

which was first presented in a post-trial submission.  Therefore, judgment is entered in favor of

Counterdefendant Sherwood and against Counterdefendant Eleanor Levie on Count IV.  In

addition, Counterdefendants' request for punitive damages is denied.

IV      Conclusion

For the reasons stated above, judgment shall be entered in favor of Defendants and

against Plaintiff as to all remaining Counts in Plaintiff's Complaint.  Judgment is entered in

favor of Counterdefendant Sherwood and against Counterplaintiff Leonard Levie as to his

counterclaims.  As for Eleanor Levie's Counterclaims judgment is entered in favor of Eleanor

Levie as to Count I and Count III, as specified above, and in favor of Sherwood on Count I, as it

relates to the "registration rights" claim, and Count IV, as specified above.  Count II of Eleanor

Levie's Counterclaim is rendered moot.  A separate Order and Judgment will follow.


Dated: March 24, 2006                              /s/_____
                                                   Richard D. Bennett
                                                   United States District Judge